IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02890-MEH

JUSTIN J. E. MABIE,

     Plaintiff,

v.

WALEED ABDALATI,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

     Before the Court is Defendant's Motion to Dismiss (ECF 24) which is fully briefed. Oral argument would not materially assist in the Motion's adjudication. For the foregoing reasons, the Motion is granted.

## <u>BACKGROUND</u>

### I.    Documentary Evidence

     "Generally, the sufficiency of a complaint must rest on its contents alone." *Gee v. Pacheco,* 627 F.3d 1178, 1186 (10th Cir.2010). There are limited exceptions to this general rule by which a court may consider materials beyond the four corners of the complaint. *Id.* These three exceptions are: "(1) documents that the complaint incorporates by reference; (2) documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity; and (3) matters of which a court may take judicial notice." *Id.* (internal citations and quotations omitted). A court may consider such documents without converting a motion to dismiss into a motion for summary judgment. *Tal v. Hogan*, 453 F.3d 1244,

1264 n.24 (10th Cir. 2006) (permitting a court to take judicial notice of facts that are a matters of public record). *See also N.E.L. v. Gildner*, 780 F. App'x 567, 571 (10th Cir. 2019).

The Court includes in the present Rule 12(b)(6) analysis the documents that Plaintiff attaches to his Complaint (ECF 1) and Amended Complaint (ECF 22) for several reasons. First, they are documents that Plaintiff himself submits and discusses in his pleadings, and they are central to his claims of wrongdoing. Second, an independent review of the underlying documentary record is essential to understanding the pleadings. This is because Plaintiff still leaves many material points unaddressed, even after the opportunity to amend his complaint. He leaves unclear exactly who his employer was; how his position's chain of command operated; what wrongdoings were the subject of his claimed whistleblowing activities; how his employer reacted to his whistleblowing activities; what forms of retaliation or adverse employment action he suffered as a result; how he raised those concerns internally; and what forms of administrative redress he pursued before filing this lawsuit. Third, the authenticity of the submitted documents is not disputed. Nor does Defendant object to Plaintiff's discussion of them. The Court considers them solely for general background and context purposes.

<u>The Litigants and Involved Third Parties</u>

In his Amended Complaint filed February 17, 2022 (ECF 22), Plaintiff says he is at least forty-five years of age and "has worked as a member of the [University of Colorado] faculty since October 2005." *Id.* at ¶ 4. He adds that he is a Doctor of Science (*id.*) presumably meaning he holds a Ph.D. The Court notes that in May 2019, he was working on his dissertation. ECF 22-8 at 3. Plaintiff signs his emails as a space weather specialist and a member of the University of Colorado faculty. ECF 2-7 at 6. During the time period relevant to this lawsuit, Plaintiff worked for the Cooperative Institute for Research in Environmental Sciences ("CIRES"). ECF 22 at ¶ 5.

Plaintiff used a work email address from the National Oceanic and Atmospheric Administration ("NOAA") which is part of the U.S. Department of Commerce. He "worked at NOAA" for many years, but he denied being a federal government employee (although he desired to become one). ECF 2-26 at 8. All human resources matters relevant to this lawsuit were conducted through CIRES. Plaintiff then appealed CIRES' actions to the University of Colorado. ECF 22-7. In one such appeal, Plaintiff invoked the *Professional Rights and Responsibilities of Faculty Members and Roles and Professional Responsibilities of Academic Leaders* ("PRR"). *Id*. The University of Colorado's Boulder Faculty Assembly promulgated the PRR, and he submits it separately into the record. ECF 2-9.

Terence Bullett is a Ph.D. scientist and Plaintiff's immediate supervisor. Dr. Bullett also used a NOAA email work address, and his signature block indicates affiliation with NOAA, its National Centers for Environmental Information ("NCEI"), and CIRES. CIRES/NCEI is his employer (through the University of Colorado) for which he works as a Research Associate. ECF 2-23 at 1, 4. At other times, Dr. Bullett has used a University of Colorado work email address. ECF 2-4 at 1; ECF 22-24. In one email, Dr. Bullett described himself "as a CU employee supporting NOAA objectives." ECF 22-11 at 2. Plaintiff and Dr. Bullett worked together on a project for NOAA through "NESDIS" pursuant to a cooperative agreement with NCEI. ECF 2-7 at 2. Dr. Bullett is a nonparty to this litigation. However, the documents suggest that he and Plaintiff had a close working relationship, and they participated jointly in the underlying events.

Defendant is the Direct of CIRES and a former NASA chief scientist. ECF 22 at ¶ 5. The attached documents suggest that Defendant had supervising authority over both Plaintiff and Dr. Bullett.

The third party who was the object of Plaintiff's employment disputes is another research scientist. For present purposes, the Court refers to him by his initials "NAZ" rather than his full name, because he is not a named litigant, and because Plaintiff makes very serious allegations against him in the underlying documents. The record suggests that during the relevant time period, Plaintiff, Dr. Bullett, and NAZ all received funding from the same CIRES source which Defendant oversaw. ECF 2-27 at 8.

<u>The Start of Conflict in the Workplace</u>

The record contains a timeline (ECF 2-8) that Plaintiff created in early July 2021 to explain to Defendant his grievances. ECF 2-10 at 3. That timeline shows increasing conflict between Plaintiff and Dr. Bullett on the one hand and NAZ on the other. The first dispute with NAZ arose sometime in 2017. ECF 2-8 at 1. The second grew out of a personal agreement on April 19, 2018 about how NAZ would use facilities and equipment for his research project in a way that would not interfere with Plaintiff's work. A third arose in mid-August 2018 over facility and equipment use. From that point, conflicts between Plaintiff (along with Dr. Bullett) and NAZ only escalated and intensified. Plaintiff identified several different sources of conflict with NAZ ranging from practical matters (not sharing equipment); competing research interests and goals; disputes over who is in charge and decision-making authority; acts of dishonesty; and alleged violations of law and ethics (beginning on August 23, 2018 with the accusation that NAZ receives improper kickback payments from an equipment vendor). NAZ began to push back and demanded meetings to resolve the accusations against him. *Id*. at 1-2.

Plaintiff referenced an act of whistleblowing that occurred during this time in 2018. ECF 2-26 at 8. Presumably, it is the same act that Defendant discussed in an email to Plaintiff on September 26, 2018. Defendant wrote Plaintiff about serious matters that had arisen in various

email exchanges. ECF 2-4; ECF 2-5 at 1. The first concerned Plaintiff's act of bypassing his supervisory chain of command (which begins with Dr. Bullett and ends with Defendant) and issuing his own direct instructions to a federal agency. Defendant clarified that Plaintiff is "not a federal employee." *Id*. at 2. The second matter of concern was the content of Plaintiff's communication with that federal agency in which he asked its director for help redressing a threat of retaliation for conducting protected whistleblower activities. Defendant complained that Plaintiff's retaliation grievance lacked any details and that he should have sought relief internally. Defendant did not regard a personal disagreement "with the handling of data that has gone through a federal decision-making process" as a legitimate whistleblower act, but by claiming it as such, Plaintiff had "trigger[ed] certain reporting responsibilities on the federal side [that] should not be loosely used." ECF 2-4 at 1-2.

Defendant discussed additional matters. He instructed Plaintiff not to interfere with others' supervisory roles when they, "not you, are charged with making the determination as to how the data are archived and managed," because they are "the official stewards of the data." *Id*. at 2.  He also reminded Plaintiff that the federal entity, NCEI, provides the research facility and infrastructure. As a courtesy, NCEI permits Plaintiff access to them for his own personal research activities, but ultimately, use of those resources is "for the single purpose of fulfilling specific NCEI functions." Consequently, "[a]s long as you work in that building and use NCEI resources, you need to recognize that your actions need to be sufficiently aligned with the NCEI mission, so as to justify the subsidy they provide." *Id*. at 2.

On October 10, 2018, Dr. Bullett complained about a hostile work environment. An in-person meeting on January 3, 2019 became confrontational, and Dr. Bullett accused NAZ of procurement fraud. ECF 2-8 at 1-3.

5

<u>Events in 2019</u>

As Plaintiff's timeline suggests, the adversarial relationship between Plaintiff and Dr. Bullett on one hand and NAZ on the other worsened over the course of 2019. Essentially, each side accused the other of being difficult to work with, and NAZ continued to resist the restrictions that Plaintiff and Dr. Bullett were imposing on him and his project. Dr. Bullett regarded NAZ's complaints as harmful to his reputation. In March 2019, Dr. Bullett filed an ethics complaint against NAZ. *Id*. at 4.

Plaintiff's timeline shows that in May 2019, NAZ wanted to begin a new project for which he asked Plaintiff and Dr. Bullett to share their research data and to grant access to certain equipment and systems. *Id*. at 5. Plaintiff's offers of support to NAZ were very much qualified in nature. ECF 22-8. In a later email to Dr. Bullett, Plaintiff recounted how NAZ had betrayed their trust, after which they stopped helping NAZ with the project. Plaintiff criticized NAZ for pursuing project approval and funding despite their refusal to help with it. ECF 22-19 at 2.

<u>Ongoing Resistance to Cooperating with NAZ</u>

Plaintiff's timeline shows that over the course of 2019, 2020, and into 2021, Plaintiff and Dr. Bullett resisted cooperation with and were critical of NAZ. In response, NAZ's frustration grew. ECF 2-8 at 5-6.

Plaintiff highlights in his timeline an incident on February 19, 2021 when Dr. Bullett denied NAZ access to a data set. On February 28, 2021, Plaintiff reported security concerns about NAZ's activities to the "AFRL PI," which reacted by opening an investigation into NAZ. Although that investigator later restored NAZ's access, Plaintiff and Dr. Bullett continued to deny him access to equipment and systems through June 2021. *Id*. at 6-7.

Defendant wrote Plaintiff about the matter on June 29, 2021. ECF 2-5 at 1-3. As Defendant saw it, Plaintiff not only should fulfill the commitment he himself had made to support a particular project, but do so to help the University meet its own obligations to the federal government. Regarding a second project, Defendant construed Plaintiff's emails to NAZ as implying his willingness to help. Should Plaintiff feel unable to honor those commitments, Defendant offered to replace him with someone who would. Defendant reminded Plaintiff that he must state a compelling justification (which he had not yet articulated) before he may decline another's access to equipment that belongs to the University. Lastly, Defendant felt that Plaintiff's conflict with NAZ was personal. Because Plaintiff's "interactions with him are not productive," Defendant invited Plaintiff to nominate someone else who could support NAZ's pursuits. *Id*. Both in his letter and in follow-up emails, Defendant stressed the importance of finding a way to accommodate the research needs of Plaintiff, Dr. Bullett, and NAZ, and he emphasized the need for Plaintiff and Dr. Bullett to substantiate their complaints of interference. *Id*. at 3-5.

Plaintiff wrote Defendant on July 2, 2021. ECF 2-7 at 3-6. He complained that the "ongoing investigation into this matter" had created "a hostile workplace." Plaintiff was concerned about both his safety and Dr. Bullett's health. He regarded Defendant's "orders" as inconsistent with both "longstanding principles of academic freedom or law" and due process rights. Plaintiff maintained that he and Dr. Bullett "fulfilled all commitments" with NAZ "in good faith," *although* (1) they properly terminated their involvement in one particular project after NAZ had breached an agreement with them, and (2) their offer to help with the other project had created no enforceable commitment. Plaintiff and Dr. Bullett rejected Defendant's assertion that the University of Colorado owned "the instrumentation that [NAZ] is demanding access to," but regardless, it was "not possible for [NAZ] to be supported using the instrumentation." Plaintiff

accused NAZ of being "engaged in acts that harm the interests of ourselves and other persons and/or entities" and "harm the NOAA mission." *Id*.

On July 6, 2021, Plaintiff requested "a face to face meeting" with Defendant, Dr. Bullett, a third party, and Dr. Tatiana Sazonova[1] "with a focus on integrity [and] ethics concerns." The purpose of Plaintiff's proposed meeting was to address "allegations" against him and Dr. Bullett. ECF 2-7 at 3. Plaintiff stated that NAZ had fired them from one particular project, and he maintained that they had cooperated with NAZ in good faith. Plaintiff furthered that NAZ continues to be a security risk. Plaintiff asserted academic independence. Plaintiff asked Defendant for "a detailed breakdown of [NAZ's] demands," and he and Dr. Bullett would "do our best to help you understand the situation and figure out how to move forward." *Id*.

On July 7, 2021, Defendant asked Plaintiff to substantiate the very serious allegations he was making, and he expressed frustration over the inability to "get straightfoward answers" from Plaintiff. Even if Plaintiff is a team leader, Defendant asserted his greater authority as Director to "speak to whomever I deem appropriate on matters of CIRES business." Defendant repeated the University of Colorado's claim of ownership over property for which he, as the Director, serves as custodian. As Director, he must balance Plaintiff's interests in his personal projects against the interests of others (including NAZ) and the University on the whole. ECF 2-7 at 1-2.

On July 27, 2021, Defendant scheduled a meeting to address the issues about Plaintiff's failure to accommodate NAZ's request for help (ECF 22-9), but he declined to allow Plaintiff's wife, Dr. Sazonova, to attend because it would be "inappropriate for a federal employee,

---

[1] Dr. Sazonova is Plaintiff's wife. She is a former research scientist at both CIRES and the University of Colorado's engineering department. She now is a federal geophysicist, and her work email address indicates that she works for the U.S. Department of the Interior. Plaintiff sought her involvement in the meeting as a "stakeholder" in his dispute with Defendant. ECF 2-10 at 1; ECF 2027 at 9.

particularly one with a personal relationship with a key player in this matter" to do so (ECF 2-10 at 2). Also attending the meeting would be the CIRES' Human Resources Director Angela Knight and a person external to CIRES whose role would be to ensure that "integrity and ethics are the priority guiding principles." The meeting's purpose was to ensure "that appropriate use of equipment is practiced in a way that does not compromise sponsored activities or other CIRES, employee, and university interests." *Id*.

Plaintiff wrote Defendant in advance of the meeting. ECF 2-10 at 3. He said that Dr. Bullett "felt physically threatened by [NAZ]" and that both Dr. Bullett and he regarded the work environment as "extremely hostile." Dr. Bullett had become "physically ill" as a result. Plaintiff disagreed with Defendant's characterization of his emails as confrontational, accusatory, demanding, disrespectful, poorly informed, and inconsistent with the expectations of a CIRES/University of Colorado employee. Plaintiff expressed concern "that several very high-level people within the University have decided to take control of our research program." *Id*.

<u>Letter of Expectation</u>

On August 3, 2021, Defendant issued a formal "Letter of Expectation" to Plaintiff. ECF 2-12. At issue was Defendant's investigation of "a complaint from the College of Engineering that revolved around access to scientific instruments that are the property of CU Bolder." That investigation involved Plaintiff, Dr. Bullett, and others. Throughout his interactions with Plaintiff, with the exception of a July 28th meeting (at which Plaintiff still disagreed with and challenged Defendant but in a constructive and respectful fashion), Defendant expressed frustration that Plaintiff's behavior:

> has been consistently unprofessional and overall disrespectful toward me, the situation, and the entities involved in resolving this complaint. You have on multiple occasions failed to recognized my authority as Director of CIRES, not responded directly to my repeated inquiries, and have made unsubstantiated

allegations against other university employees. This is not the first time I have experienced inappropriate and unprofessional behavior from you. I sent you an email on September 26, 2018 raising concerns about your manner of interaction and articulating my expectations, and your correspondence since then have not been aligned with the expectations I spelled out.

*Id*. at 1. The Letter of Expectation was the result of Plaintiff's repeated unprofessionalism and direct insubordination. Defendant specified what Plaintiff must do to bring himself into compliance or else face "further action up to and including termination of your employment with the University of Colorado at Boulder." *Id*. at 2.

Both Defendant and Human Resources Director Knight explained the letter's purpose was not to reprimand or sanction Plaintiff but rather to clarify expectations. ECF 2-11; ECF 22-12; ECF 2-26. In reacting to the letter, Plaintiff told Dr. Bullett that "[a]s you predicted, talking to this guy for a week has done nothing but get me into trouble" and that "[e]ven pointing out that granting [NAZ] access to [a particular equipment site] is not my authority only made [Defendant] madder." ECF 22-12.

Plaintiff appealed to Terri Fiez, the University's Vice Chancellor for Research and Innovation, on August 26, 2021 on the basis that the letter was a form of sanction and reprimand. ECF 22-7. Plaintiff regarded the letter as "retaliation" for "engaging in legally protected activities." He objected to the failure to comply with PRR procedures, the lack of due process, and the situation not meeting the PRR's standard for sanctionable incivility. He furthered that the letter contained "misrepresentations, factual inaccuracies and is not representative of the circumstances." He complained of "retaliatory actions" that were causing "harm to my career progress, harm to my reputation with my colleagues and with NOAA," and the creation of "an overtly hostile workplace." *Id*.

Vice Chancellor Fiez denied his appeal. ECF 22-7 at 2-3. Although the Letter of Expectation was part of his personnel file, he explained, it did not constitute as a sanction or reprimand, and therefore, it was not subject of PRR procedures. Moreover, the PRR applies only to tenured or tenure-track faculty whereas Plaintiff has an "at-will faculty appointment." The Vice Chancellor forwarded Plaintiff's complaint about retaliation and hostile workplace to the University's Office of Institutional Equity and Compliance ("OIEC"). *Id*.

<u>Defendant's Letter of August 26, 2021 and Dr. Bullett's Reprimand</u>

On August 11, 2021, Defendant scheduled a meeting to discuss NAZ's inability to access a computer system. ECF 22-11 at 1. With the participation of several other University officials and after giving the matter "a lot of thought and consideration," Defendant set forth the terms by which NAZ could access the system. The terms would balance "the diversity of interests and commitments in a way that does not allow any one person to hinder the sponsored activities of another or excessively interfere with your respective research interests." Defendant memorialized them in the form of a formal written letter found in the record at ECF 2-15, which Defendant gave to both Dr. Bullett and Plaintiff. On August 31, 2021, Defendant described the letter as "a good-faith attempt to balance all interests." Because it does not count as a sanction, Defendant explained that the procedures and protections of the PRR were not implicated. Nevertheless, Defendant gave permission to appeal to Vice Chancellor Fiez if Dr. Bullett wished. ECF 2-16 at 7.

Despite the letter's express purpose to resolve the matter, Dr. Bullett remained "in a negotiation phase" about giving NAZ access to certain computer systems. ECF 2-16 at 1-8. On September 2, 2021, Defendant reiterated his expectation that Dr. Bullett comply with the letter. Should Dr. Bullett continue to refuse NAZ access, he would regard it as insubordination subject to disciplinary action including possible termination. ECF 2-17 at 3-4.

On September 3, 2021, Dr. Bullett wrote a third-party NOAA official (with a copy sent to Plaintiff) to report:

> an ongoing security incident where a non-Government person is using a position of authority to forcibly obtain root level computer access for another non-Government person who has previously been identified as a security risk. The computer systems are on US Government property at multiple agencies, and may be connected to US Government networks. There are red flags that raise concerns of possible espionage.

ECF 2-18. That same day another NOAA official wrote Defendant to say that Dr. Bullett had raised "some very serious concerns." ECF 2-17 at 2-3. On September 8, 2021, NOAA's IT Chief informed Defendant that:

> [a]fter reviewing the limited additional information provided by Dr. Bullett, I find no credible evidence of an impending threat to NOAA IT systems or worse, to national security. My understanding is that you too have investigated the concerns raised by Dr. Bullett and found no reason to deny access to [NAZ].

ECF 2-20 at 1-2.

On September 13, 2021, Dr. Bullett asked the head of another institute, the Cooperative Institute for Research in the Atmosphere ("CIRA"), if it would like to host the research that he and Plaintiff were doing at CIRES. The institute head declined citing various reasons including avoiding treading on a sister institute's programs. ECF 2-21.

On September 20, 2021, Defendant issued Dr. Bullett a formal letter of reprimand. ECF 2-23. Many reasons were given for the reprimand. One was his apparent use of a security threat as a means either to intentionally damage relationships or to leverage a subjectively favorable outcome in his favor. Another was NAZ's continued lack of access to computer systems. The reprimand letter did not reference Plaintiff.

12

<u>Plaintiff Becomes Solely Responsible for Providing NAZ System Access</u>

Although Dr. Bullett was the focus of the reprimand, both he and Plaintiff were involved in the renewed effort to give NAZ access to computer systems. ECF 2-24 at 1. Then, just three days after the reprimand, Plaintiff took over for Dr. Bullett completely. *Id*. at 8. On September 21, 2021, Dr. Bullett went to the hospital "because of stress induced medical symptoms caused by this situation." "The task of administering the VIPIR systems," Dr. Bullett furthered, had "become an imminent risk to my health and the well being of my family." In addition, he had been performing that task "as a service to our community and have no obligations." Therefore, he was giving up the role, and he went on medical leave. ECF 2-24 at 5. Also on September 21, 2021, Plaintiff informed Human Resources Director Knight that Dr. Bullett's "possible medical emergency . . . clearly seems to have been caused by the increasingly hostile workplace which I brought to your attention on July 27." ECF 2-26 at 1. Ms. Knight forwarded Plaintiff's report to the University's OIEC. *Id*. at 2.

On September 23, 2021, Plaintiff reported to Ms. Knight that workplace stress was causing him medical problems as well. The situation had worsened his Tourette syndrome (although he was not requesting an accommodation for his disability). He complained of a hostile workplace and attacks against him. He reported that Dr. Bullett had extensive documentation of how the two of them were under attack from someone who is very powerful, enraged, and mentally unstable. Plaintiff feared for the physical safety of himself and his family. ECF 2-26 at 5-6, 10. Ms. Knight scheduled a meeting for September 27, 2021. *Id*. at 10.

NAZ still had no access to needed computer systems. ECF 22-14 at 1-9; ECF 22-15 at 1-7; ECF 2-27 at 1-15. On October 1, 2021, a professor in the mechanical engineering department informed Defendant that Dr. Bullett appeared to be working on the system despite being out on

medical leave. ECF 2-27 at 5. That same day, Defendant asked Plaintiff why NAZ still lacked access. *Id*. at 3.

On October 3, 2021, Plaintiff quit his temporary role as system administrator citing harassment, aggravation of his Tourette syndrome, and interference with his own research obligations. *Id*. at 7. Defendant referred him to the OIEC for his complaints of hostile work environment and medical distress. However, he instructed Plaintiff to fulfill his system administrator duties. Because CIRES was funding the research of Plaintiff, Dr. Bullett, and NAZ, Defendant asserted his "authority to direct the nature of work done with CIRES funding." Defendant also stressed the need for both Plaintiff and the University to honor their respective research commitments. *Id*. at 7-8. Nevertheless, Plaintiff continued to resist serving as the systems administrator on the basis that oversight of the NAZ matter was depriving him of independence. *Id*. at 10-11; ECF 22-15 at 7.

On October 26, 2021, Plaintiff filed a whistleblower retaliation complaint with the Occupational Safety and Health Administration ("OSHA"). ECF 22-17. Shortly thereafter, OSHA closed the file because Plaintiff's complaint involved the enforcement of laws outside its jurisdiction. ECF 22-18. Plaintiff filed this lawsuit on October 28, 2021. ECF 2.

<u>Equipment Ownership Inquiry</u>

In October 2021, the University's Office of Contracts and Grants began reviewing agreements with various third-party federal governmental agencies that concerned shared equipment and facilities, including equipment that Plaintiff and Dr. Bullett were using. In response to the Office's initial email, Dr. Bullett wrote Plaintiff that "[t]he chess game continues as more players are brought onboard" and opined that "[t]hey only want the destruction of this project and the NOAA ionosode effort, and of course, us personally." ECF 22-2 at 1.

Dr. Bullett claimed ownership rights to the "VIPIR" equipment (ECF 22-2; ECF 22-3) through his company, Front Range Radio, LLC (ECF 22-3 at 4-5; ECF 22-4 at 6; ECF 22-11 at 2). Dr. Bullett's claim of property ownership prompted the University's Conflicts of Interest and Commitment office to investigate. ECF 22-5. The uncertainly over equipment ownership also resulted in the suspension of a particular contract. ECF 22-4 at 7. On December 15, 2021, NASA asserted its ownership over the equipment. *Id*. at 2.

On November 22, 2021, a third-party research entity asked Dr. Bullett why NAZ lacked access to two systems. The entity's representative offered "to help smooth out" any "kind of issue that has arisen between [Dr. Bullett] and [NAZ]." Dr. Bullett told Plaintiff that he was "going to have fun answering this tomorrow," and that "it [would] be quite enjoyable to enumerate the grievances." ECF 22-19 at 1. Plaintiff advised Dr. Bullett to explain how NAZ had "betrayed our trust in 2019," taken on the project despite knowing they would not help, and refused to work toward a solution when they did offer help in June. *Id*. at 2. Dr. Bullett informed the third party that NAZ was providing conflicting information; NAZ was requesting the system's mode be set as "all the time forever" which Dr. Bullett regarded as "ridiculous," and there were "serious concerns of possible espionage efforts" by NAZ which had "produced major problems within CU, resulting in sanctions issued against [both Dr. Bullett and Plaintiff]." He accused NAZ of constantly lying about his experiment. *Id*. at 3.

## II.    Plaintiff's Allegations

Having used the documentary evidence to understand the surrounding context of Plaintiff's claims, the Court turns next to his allegations. For purposes of this ruling, the Court accepts as true the factual allegations—but not any legal conclusions, bare assertions, or conclusory allegations— that Plaintiff raises in his First Amended Complaint ("FAC") at ECF 22. *See generally Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (accepting as true a plaintiff's factual allegations for purposes of Fed. R. Civ. P. 12(b)(6) analysis).

Plaintiff states that in July 2018, he filed a whistleblower complaint with the Inspector General of the U.S. Department of Commerce ("DOCOIG"). The attached documents contain an email from Plaintiff to Human Resources Director McKnight in which he references a 2018 whistleblower incident. However, he does not provide the actual document. Nor does the FAC reveal the subject of his whistleblowing disclosure. *Id*. at ¶ 6.

Plaintiff points to the formal email that Defendant had sent him on September 26, 2018. He characterizes that email as "scold[ing him] for engaging in whistleblower activities." He furthers that Defendant "issued guidance that [was] contrary to federal rules on reporting of fraud, waste, and abuse" and "ordered [him] to work through a fabricated supervisorial chain." *Id*. at ¶ 7.

Plaintiff objects to the email (ECF 2-5 at 1-3) that Defendant sent him on June 29, 2021. He complains that in it, Defendant instructed him to: (1) help NAZ with a new project despite neither he nor Dr. Bullett committing themselves to help, (2) take actions on the basis of a false claim of property ownership on behalf of the University, and (3) take actions contrary to academic independence principles. ECF 22 at ¶¶ 8-9, 12. Plaintiff recounts the subsequent correspondence over the course of 2021 between him (along with Dr. Bullett) and Defendant about their objections to (1) helping NAZ, (2) how Defendant had handled the lingering dispute over the years, and (3) Defendant's negative comments about Plaintiff. Plaintiff told Defendant that the work environment had become hostile and threatening, and it was causing him physical illness.

Defendant allowed NAZ computer access despite security concerns. Plaintiff says the U.S. Air Force had blocked NAZ's access because of "snooping" for "controlled information regarding a [USAF] experiment." ECF 22 at ¶ 26. Plaintiff also accuses NAZ of harming an equipment

installation and installing software without permission, all of which resulted in an erosion of trust. *Id*. By ordering Plaintiff and Dr. Bullett to help NAZ nevertheless, Defendant acted contrary to federal law. *Id*. at ¶ 28. Defendant also "exert[ed] improper influence over the decision-making process of Plaintiff's federal chain of command." *Id*. at ¶ 46.

Plaintiff accuses Defendant of various forms of workplace wrongdoing. Presumably in reference to his wife, Dr. Sazonova, (ECF 22-9), Plaintiff says that on July 27, 2021, Defendant denied him his "right to have an advocate present for an upcoming online meeting. ECF 22 at ¶ 17. He gave up an important duty (presumably as group leader) because "of Defendant['s] bullying and harass[ment]." *Id*. at ¶ 24. Defendant denied Plaintiff's request to be removed from the situation that was causing a hostile workplace. *Id*. at ¶ 89.

Plaintiff regards the Letter of Expectation (ECF 2-12) as an employment sanction without a supporting basis, noncompliant with procedures, and creating disproportionate adverse effect. *Id*. at ¶¶ 22, 27. His only available remedy was to appeal to Vice Chancellor Fiez who denied him relief. *Id*. at ¶ 27. Plaintiff also filed a retaliation complaint with OSHA on October 26, 2021. *Id*. at ¶¶ 105, 107.

Plaintiff complains that Defendant made baseless threats of employment sanctions against Dr. Bullett on September 2, 2021. *Id*. at ¶¶ 35-36. This includes an allegation that Defendant reacted improperly to Dr. Bullett's whistleblower complaint (*id*. at ¶ 47), presumably in reference to Dr. Bullett's email to NOAA on September 3, 2021 about misuse of computer systems (ECF 2-18). Plaintiff regards the Letter of Reprimand that Dr. Bullett received on September 20, 2021 (ECF 2-23) as an adverse action taken in response to Dr. Bullett's refusal to break federal law. ECF 22 at ¶ 60. The adverse action taken against Dr. Bullett is "consistent with what [Defendant]

did in issuing sanction to Plaintiff," and the many flaws underlying Dr. Bullett's Letter of Reprimand stem from the "series of arbitrary and capricious expectations" against him. *Id.*

Plaintiff says that the October 2021 property ownership inquiry was initiated with the intent to delay his (and Dr. Bullett's) new salary contract (*id.* at ¶¶ 76, 99-103) and to harm his reputation (*id.* at ¶ 80). Plaintiff adds that the Science Applications International Corporation ("SAIC") contract negotiated by Mr. De Maria, the CIRES Deputy Finance Director, was undertaken for the purpose of amending its terms in a way that would enable the University to terminate both Plaintiff and Dr. Bullett. *Id.* at ¶ 106. Plaintiff regards Mr. De Maria's involvement as "clear evidence of an ongoing conspiracy to retaliate against Plaintiff and Dr. Bullett." *Id.* Plaintiff makes the same allegation concerning the involvement of Nick Vita, the University's Senior Contract Officer, in the SAIC contract negotiation. *Id.* at ¶ 110. The contract at issue was a fixed-term contract between the University and the SAIC, and it provided the funding for Plaintiff's salary. *Id.* at ¶¶ 94, 98, 99; ECF 22-20.

The FAC discusses events that occurred after the period of time covered by the submitted documents. Plaintiff says that in late November 2021 through January 2022, various University officials allowed the SAIC contract to expire. The University would not move forward on contract renewal until Plaintiff and Dr. Bullett were terminated. ECF 22 at ¶ 110. On December 1, 2021, CIRES Finance Director Gretchen Richard cancelled Dr. Bullett's trip to do maintenance at a facility. *Id.* at ¶ 112. On December 15, 2021, Assistant Vice Chancellor Henry ordered Dr. Bullett to stop work that the contract had funded. The Court notes that Plaintiff appears to exclude termination as one of the adverse employment actions that is subject of his retaliation claims. ECF 26 at 9.

Focus shifted to Dr. Bullett in retaliation for Plaintiff filing the instant lawsuit, with Vice Chancellor Fiez taking the matter over from Defendant. *Id*. at ¶¶ 117-118. Dr. Bullett only agreed to give computer access upon the threat of not being paid. *Id*. at ¶ 122. On January 20, 2022, the University began a retaliation-motivated audit of Dr. Bullett. *Id*. at ¶ 121. The SAIC contract was renewed on February 28, 2022, but according to Plaintiff, it was amended in a way to permit the termination of Dr. Bullett's and Plaintiff's employment. *Id*. at ¶ 123.

Plaintiff claims that he has been harmed by employment loss, a hindered search for new employment, and deterioration of physical and mental health. *Id*. at ¶¶ 125-128. He also claims intentional harm to his professional reputation and standing. ECF 26 at 9.

Plaintiff uses his Response (ECF 26) to clarify the record. He specifies that NAZ's computer access was not "denied," but rather "removed." The computer system at issue "is not a 'research system computer'" (to which NAZ never had access in the first place) but rather "a system that delivers data to NOAA and provides internet access to a research system." Plaintiff denies claiming that NAZ engaged in actual espionage. Instead, he only "raised concerns of possible espionage," although he furthers that those "concerns . . . still have not been addressed." For the first time, Plaintiff says that *Defendant* also "may be a foreign agent engaged in acts of espionage." *Id*. at 1-2.

### III.  Claims

Plaintiff complains of wide-ranging harassment, bullying, and a hostile work environment. In essence, though, Plaintiff's grievance boils down to one of retaliation for engaging in protected activities generally (ECF 22 at ¶ 64) and/or the specific protected activity of his initial 2018 DOCOIG whistleblower complaint (*id*. at ¶ 71). In his Response, he clarifies that the act(s) of

retaliation occurred in 2021 in reprisal for whistleblower actions that occurred in 2018 and 2021. ECF 26 at 4.

In his FAC, Plaintiff brings two counts for retaliation in violation of the federal Whistleblower Protection Act under both 5 U.S.C. § 2302 that applies to federal employees and 41 U.S.C. § 4705(b) that covers federal contractors. Count Three asserts an antitrust violation under the Sherman Act, 15 U.S.C. § 1.

## LEGAL STANDARDS

### I.      Fed. R. Civ. P. 12(b)(6) Failure to State a Claim

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of a plaintiff's complaint. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleads facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. *Twombly* requires a two-prong analysis. First, a court must exclude "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Iqbal*, 556 U.S. at 679–80. Second, a court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the well-pleaded averments state a plausible claim for relief, then it survives a motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged

their claims across the line from conceivable to plausible.'" *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). "The plausibility standard does not require a showing of probability that 'a defendant has acted unlawfully,' but requires more than 'a sheer possibility.'" *Parshall v. Health Food Assocs., Inc.*, No. 14-4005-JAR, 2014 WL 2547761, at *1 (D. Kan. June 5, 2014). While the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id*.

## II.     Fed. R. Civ. P. 12(b)(1) Lack of Subject Matter Jurisdiction

Rule 12(b)(1) of the Federal Rules of Civil Procedure requires a federal court to dismiss claims over which it lacks subject matter jurisdiction. A dismissal under Rule 12(b)(1) is not a judgment on the merits; it is merely a determination that the court does not possess authority to hear the matter in the first place. *Butler v. Kempthorne*, 532 F.3d 1108, 1110 (10th Cir. 2008) (federal courts should exercise restraint and "there is a presumption against [federal] jurisdiction"). A Rule 12(b) motion accepts "all well-pleaded facts in the complaint as distinguished from conclusory allegations." *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001). Plaintiff bears the burden of establishing subject matter jurisdiction. *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1151 (10th Cir. 2015).

> A motion to dismiss under Rule 12(b)(1) may challenge jurisdiction in two ways:
>
> First, a facial attack on the complaint's allegations as to subject-matter jurisdiction questions the sufficiency of the complaint.  In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true.  Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject-matter jurisdiction depends.  When reviewing a factual attack on subject-matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations.  A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).  In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

*Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995). Because the Court construes Defendant as making a facial attack, it assumes as true Plaintiff's allegations.

## III.     Treatment of a *Pro Se* Complaint

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers." *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997). The Tenth Circuit interprets this rule to mean that if a court

"can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, that does not mean that a court should "assume the role of advocate for the *pro se* litigant." *Id.* A court will not assume fact allegations that have not been pleaded or construct a legal theory on the plaintiff's behalf to round out the complaint. *Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998).

## DISCUSSION

Plaintiff's primary claim for relief concerns federal whistleblower protection, which he bases on two statutes. The first statute, 5 U.S.C. § 2302, applies to federal employees generally, and the second statute, 41 U.S.C. § 4705(f), governs federal contractors. The Court notes that another statute, 41 U.S.C. § 4712, currently operates in the place of Section 4705. 41 U.S.C. § 4705(f).

## I.    Federal Whistleblower Protection

### A.    5 U.S.C. § 2302

The first statute on which Plaintiff relies, 5 U.S.C. § 2302(b)(8)(A), prohibits adverse employment action against an employee who lawfully discloses information about a "violation of any law, rule, or regulation" or "gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." However, that statute's whistleblower protection applies only to *federal* employees (of executive branch agencies). *Hurley v. Ithaca City Sch. Dist.*, 20-CV-0328, 2020 WL 1937561, at *5 (N.D.N.Y. Apr. 22, 2020) (collecting case law that limits the statute's coverage). A state university entity "clearly is not a federal agency under the statute." *Dent v. Univ. of Maryland*, No. CIV-16-2446, 2017 WL

2537009, at *8 (D. Md. June 12, 2017). Plaintiff concedes that he is not a federal employee. ECF 22 at ¶ 4; ECF 26 at 2-3, 7. He adds that Defendant likewise is neither a federal government employee (ECF 26 at 3) nor an employee of a federal agency (ECF 22 at ¶ 5).

Section 2302(b)(8)(A) covers an act of disclosure "by an employee or *applicant*." There is nothing in the pleadings or attached documents that suggests Plaintiff made any act of whistleblower disclosure while he was an applicant for any of the kinds of federal jobs that the statute covers. Instead, he describes himself as "a prospective federal employee." ECF 26 at 3. While Plaintiff may seek federal employment in the future, the mere potential of such is insufficient to invoke the statute's protection. If only potential prospective federal employment were enough, such a construction of the term "applicant" would be no limitation at all.

There is another shortcoming with his Section 2302 claim. Before Plaintiff may bring it to federal court, he must seek relief from the Merit Systems Protection Board. The several steps required to exhaust the administrative means of relief, beginning with the Office of Special Counsel, are outlined in *Stella v. Mineta*, 284 F.3d 135, 142 (D.C. Cir. 2002). Without complying with this prerequisite, there are "no circumstances" under which the statute "grant[s] the District Court jurisdiction to entertain a whistleblower cause of action brought directly before it in the first instance." *Id*. Plaintiff argues that the exhaustion requirement does not apply because he is not a federal employee. Nevertheless, for the sake of thoroughness, the Court addresses this aspect of the claim. This Court does so because Plaintiff still invokes this statute's protection (as a prospective federal employee) and because the FAC contains Section 2302-based claims.

Despite the dispositive nature of this question and the opportunity to amend, Plaintiff still does not demonstrate how he fulfilled the administrative exhaustion requirement. At most there

is reference to a whistleblower complaint that he had filed in 2018 with the Inspector General of the U.S. Department of Commerce. He does not explain how that particular action was a proper procedural step towards satisfying the statute's administrative remedy framework. Even if it were, he does not explain how that attempt at administrative relief ended. In his Response, Plaintiff states that dismissal of his instant lawsuit "would result in a de novo case being brought in several months, containing similar allegations," and he asks for this "case to proceed and allow the findings of the Inspector General to be incorporated into the complaint once they are filed." ECF 26 at 5-6. Those statements imply that the grievance with the Inspector General remains open.

In his Response (ECF 26 at 4), he clarifies that he bases his retaliation claim on acts that occurred in 2021. Therefore, he must show the commencement of administrative remedy measures in 2021 or later. The Court notes indications that Plaintiff also has filed grievances internally within the University and externally with various federal agencies and officials. However, none of those actions appear to comply with the statute's specific administrative exhaustion framework.

In short, neither the FAC nor the underlying record shows the completion of the kind of administrative remedy exhaustion that the statute requires. Without it, he may not proceed on any Section 2302 claim in this federal civil action.

**B.      41 U.S.C. § 4712**

Plaintiff invokes the protection of another federal whistleblower statute. It prohibits reprisal against:

> [a]n employee of a contractor . . . for disclosing . . . information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, and abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a

violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

41 U.S.C. § 4712(a)(1).

The elements of a prima facie Section 4712 claim place emphasis on the involvement of a contract awarded by a federal agency to a contractor. *Armstrong v. Arcanum Group, Inc*., 897 F.3d 1283, 1287 (10th Cir. 2018) (setting forth the six elements of a Section 4712 whistleblower retaliation claim). The FAC and the attached documents indicate the general involvement of federal agencies and contracts reflecting the nature of CIRES' research projects and operations. However, Plaintiff does not establish how CIRES (for whom Defendant serves as Director) or the University (of which CIRES apparently is part) is a federal *contractor* in the way that the statute contemplates. Instead, Plaintiff contends that *he* is a federal contractor. ECF 26 at 2.

Plaintiff adds "that all [of his] work activities are related to government contracts" (*id*. at 9), but beyond that general association, he does not demonstrate what specific contract is at issue. Although not pleaded in the FAC, Plaintiff argues in his Response that the subject of his 2018 complaint was "gross mismanagement" that "was putting climate data at risk of loss." *Id*. at 9. However, that additional statement still leaves the exact contract and contractor relationship unspecified. Taken on the whole, Plaintiff's allegations and the submitted documents suggest only a tangential or indirect relationship between his employment (and the alleged adverse actions that Defendant and others at the University may have taken against him) and federal contracts or contractors.

Even if Plaintiff could plead a plausible contractor-based Section 4712 claim, he still must demonstrate administrative exhaustion before this Court may hear it. A person who suffers reprisal for making the protected disclosures "may submit a complaint to the Inspector General of the executive agency involved." 41 U.S.C. § 4712(b)(1). That step triggers different investigative

procedures, and completing them is what exhausts administrative remedies. 41 U.S.C. § 4712(b)-(c). The statute also creates an option for seeking judicial relief (and deadlines for doing so) depending on the action or lack thereof by the agency. After "exhaust[ing] all administrative remedies with respect to the complaint," "the complainant may bring a de novo action at law or equity against the contractor . . . under this section in the appropriate district court of the United States, which shall have jurisdiction over such an action." 41 U.S.C. §§ 4712(c)(2), (c)(5). Plaintiff argues that the statute's use of the word "may" creates a non-obligatory opportunity for administrative relief. Plaintiff does not explain how the purely elective option that his construction of the statute would create fulfills the purpose of pre-lawsuit administrative exhaustion. In any event, case law construes the requirement as a mandatory step and a prerequisite to a federal court's exercise of subject matter jurisdiction. *E.g. Moore v. Univ. of Kansas*, 118 F. Supp. 3d 1242, 1253 (D. Kan. 2015) (expressly rejecting the same argument as Plaintiff makes here and reading the statute "to require the complainant to exhaust administrative remedies in the described ways prior to filing an action" for purposing of invoking a federal court's jurisdiction); *Wright v. Common Ground Health Clinic, Inc*., No. CIV 16-11623, 2016 WL 4720011, at *3-4 (E.D. La. Sept. 9, 2016) (same). In his Reply, Defendant cites additional case law in support of a mandatory Section 4712 administrative exhaustion requirement. ECF 27 at 1-2.

   The record suggests that Plaintiff did file some sort of whistleblower complaint with the Inspector General of the U.S. Department of Commerce. Assuming that the U.S. Department of Commerce *could* be an appropriate agency for seeking relief for matters that occurred at CIRES, there is no indication whether Plaintiff completed that exhaustion process. The result of that particular administrative complaint is unknown. Several years have passed since its filing in mid-2018 which suggests that the deadlines for seeking judicial relief may have passed. Alternatively,

if the Inspector General still is considering the matter (which one of Plaintiff's arguments, noted above, implies), then it is premature to seek judicial relief at this time. Moreover, it was the only complaint that Plaintiff has filed with any Inspector General. Plaintiff complains of many retaliatory acts that occurred in the years afterwards, but presumably, he brought none of them to the Inspector General's attention.

## II.     Antitrust

The basic elements of an act of monopolization in violation of the Sherman Act are: (1) Defendant's possession of monopoly power in the relevant market, (2) Defendant's willful maintenance of that power, and (3) antitrust injury. *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872-MEH, 2022 WL 1225313, at *5 (D. Colo. Apr. 26, 2022). Each of those elements in turn consists of complex sub-parts, as the *Chase Mfg., Inc.* ruling demonstrates. Overall, the proper focus of antitrust law is harm to competition itself, not the competitor. *Id*. (citing *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc*., 108 F.3d 1147, 1151 (9th Cir. 1997)).

One facet of Plaintiff's antitrust theory concerns the restrictions that Defendant placed on him during his employment at CIRES and Defendant's later actions that hindered his ability to find a new job. He says their effect is to restrict interstate commerce. In his Response, he adds that his own research program no longer is moving forward and equipment systems no longer are being maintained. ECF 26 at 10. The cessation of those activities therefore are hindering "the approximately 800 professional environmental scientists under the Defendant's direction, in addition to other scientists who are affected by the alleged conspiracy." *Id*. at 11. The conspiracy allegation is based on how the director of the CIRA institute refused to host his research program without Defendant's permission. ECF 22 at ¶ 51; ECF 26 at 10.

Even after including the allegations that Plaintiff makes in his Response (in addition to what he pleads in the FAC), there still is no indication of an unlawful restraint of trade that is harming competition.  The case of *Singh v. Mem'l Med. Ctr., Inc*., 536 F. Supp. 2d 1244 (D.N.M. 2008) illustrates the deficiency. *Singh* involved an analogous situation of a plaintiff who in practical effect was in an employment dispute with the defendants. The plaintiff framed that adverse action in terms of reduced competition caused by his removal from the market as a competing radiologist, to the defendants' benefit. *Id*. at 1248. The court dismissed the Sherman Act claim for many of the same pleading defects present here. The plaintiff made only a conclusory allegation of a conspiratorial agreement. *Id*. at 1249. The focus of the alleged harm was on the plaintiff himself, not on competition. Moreover, a restriction of trade is not actionable if lawful actions caused it; liability exists only for *unreasonable* restraints on trade that lack justification. *Id*. at 1250-51. "Though couched in antitrust buzz words," *id*. at 1253, the essential thrust of Plaintiff's claim here concerns his termination, not competition. Plaintiff responds that he need not articulate "a detailed legal theory . . . in the complaint," (ECF 26 at 110, but the pleading defect is not the failure to establish all the nuanced facets of an antitrust claim. Rather, it is the more fundamental problem of not stating its essential nature in a basic way.

## III.    Leave to Amend

The Court notes the Tenth Circuit's general rule to permit a *pro se* litigant leave to amend if it is all possible that pleading defects can be cured or a plausible claim for relief be stated. *Brandt v. Crone*, No. 19-cv-03103-MEH, 2021 WL 681441, at *6 (D. Colo. Feb. 22, 2021) (citing *Reynolds v. Shillinger*, 907 F.2d 124, 126 (10th Cir. 1990)). The Tenth Circuit also permits dismissal with prejudice and without leave to amend if the futility of such is obvious. *Fleming v. Coulter*, 573 F. App'x 765, 769 (10th Cir. 2014) (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d

803, 806 (10th Cir. 1999)). The nature of the deficiencies at issue in this case means that any attempt to amend the pleading would be futile. The shortcomings remain despite the opportunity to amend in response to Defendant's first motion to dismiss. They exist despite the FAC "being a very extensive presentation of the facts that include the requisite allegations." ECF 26 at 11. The Court has undertaken its own extensive review of his allegations and the underlying documentary record that he submits in support thereof. Having done so, the Court sees no basis by which he can bring either a federal whistleblower claim over which this Court has jurisdiction to hear or a plausible antitrust claim to justify the opportunity to file a Second Amended Complaint.

## **CONCLUSION**

Through his FAC and Response, Plaintiff raises a very wide range of grievances against Defendant (and other University officials) that spans several years during his time as a research scientist at CIRES. For this Court to be able to provide redress, he must present them in the form of a legally cognizable claim for relief, and he must plead a plausible version of that claim that establishes all of its prima facie defining elements. Plaintiff does not do so here. His reliance on federal whistleblower protection statutes is unavailing because they do not extend coverage to him. During the relevant time period, he was not a federal employee (either directly or through a contractor) in a way that relates to the alleged adverse employment actions. Even if he were a covered person, he did not pursue the steps to seek administrative relief before bringing his lawsuit. In a more fundamental way, Plaintiff's antitrust theory likewise falls short of what is needed to state a plausible version of the claim.

Accordingly, Defendant's Motion to Dismiss [filed March 8, 2022; ECF 24] is **granted**. Because it lacks subject matter jurisdiction over his federal whistleblower claims, this Court dismisses them without prejudice, but the Court dismisses the antitrust claim with prejudice.

Moreover, the dismissal is without leave to amend. The Clerk of Court shall enter Final Judgment in Defendant's favor and close this case.

      Dated at Denver, Colorado, this 1st day of June, 2022.

                                    BY THE COURT:

                                    Michael E. Hegarty
                                    United States Magistrate Judge